UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: _____

| | |
|---|---|
| ANGELIA RIGGSBEE, *Plaintiff* V. GARRY MCFADDEN, in his Official Capacity as Sheriff of Mecklenburg County and in his Individual Capacity *Defendant*. | **COMPLAINT** (**JURY TRIAL DEMAND**) |

Plaintiff, Dr. Angelia Riggsbee, files this Complaint and Jury Demand against Defendant GARRY MCFADDEN, in his Official Capacity as Sheriff of Mecklenburg County and in his Individual Capacity and would respectfully show the following:

**Parties**

1. Dr. Angelia Riggsbee is a resident and citizen of the State of North Carolina.

2. Dr. Riggsbee, a Black woman, worked for the office of Sheriff of Mecklenburg County as the Director of Business Operations from March 2024 through November 2024.

3. Defendant Garry McFadden (hereinafter "Defendant") is a resident of Mecklenburg County, North Carolina and is, and at all relevant times was, the duly elected Sheriff of Mecklenburg County, and was acting within the scope of his employment and under color of law at all times pertinent to the incidents complained of herein.

4. At all relevant times, Defendant was in control of the Mecklenburg County Sheriff's Office.

5. At all relevant times, Defendant was the final decision-making authority over law enforcement policies and personnel of his office.

6. At all relevant times, Defendant was directly responsible for the appointment, retention, training, supervision and conduct of his deputies, employees, and agents.

7. At all relevant times, Defendant was acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law.

8. Plaintiff sues Defendant Garry McFadden both in his official capacity and in his individual capacity.

9. Defendant's registered address is 801 E. 4th Street, Charlotte, NC 28202. Upon information and belief, Defendant employs over one thousand (1,000) persons.

10. Defendant has waived governmental immunity for Plaintiff's common law wrongful termination claim based on its purchase of liability insurance that covers these claims.

## Venue & Jurisdiction

11. This case arises under the Court's federal question jurisdiction, 28 U.S.C. § 1331, based on Plaintiff's claim under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq.

12. Venue in this District is proper as it satisfies the requirements of 28 U.S.C. § 1391 because the unlawful employment practices occurred in this judicial district.

13. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c), and (d), in that Mecklenburg County Sheriff's Office maintains offices and conducts business in this district.

## Factual Background

14. This is a lawsuit regarding the unlawful retaliatory conduct of Sheriff Garry McFadden.

15. Sheriff McFadden was elected to serve as the 45th Sheriff of Mecklenburg County and was sworn into office on December 4, 2018.

16. Prior to his time in that role, McFadden was a detective and part of the realty television series, "I Am Homicide."

17. As part of his pivot from reality tv to the office Sheriff, McFadden created a toxic culture of retaliation and racism within the Sheriff's Department.

18. Emphasizing this point, former leadership within the department, including former Chief Deputy Kevin Canty, former Chief Deputy Christopher Allen, and retired Chief of Detention Telisa White, have publicly stated McFadden is: "classless and abusive," operating the department like a "third-world dictatorship," a "true narcissist," and creating a "a culture that fosters a toxic and abusive environment."

19. In addition to these serious accusations, McFadden has been caught on recorded audio making racially hostile remarks about his own employees, including calling a white captain a "cracker," and calling a retired Chief Deputy the n-word.

20. The Charlotte-Mecklenburg Fraternal Order of Police has also publicly criticized McFadden for making "racist comments."

### Dr. Riggsbee reports racial pay disparity

21. In March 2024, the Sheriff's office hired Dr. Riggsbee as the Director of Business Operations.

22. After she was hired, Dr. Riggsbee conducted a review of the salaries and expenses within the department.

23. During this review, Dr. Riggsbee noticed a clear issue – there was a pay disparity between a Black, female manager compared to other white employees in the same or lesser roles.

24. On or around June 19, 2024, Dr. Riggsbee provided a memo that outlined her concerns regarding racial pay equity and salary disparity issues in the office.

25. Dr. Riggsbee warned in her memo that these disparities "if not corrected could result in legal action for the MCSO."

26. Dr. Riggsbee identified and reported that she was engaging in a protected report about potential legal violations under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VII.

27. Sheriff McFadden knew that Dr. Riggsbee was reporting racial disparities in pay as part of this report.

28. Dr. Riggsbee outlined that the Accounting Manager for Resident Financial, Property, and Commissary – a Black woman – had "29 years of experience with the MCSO and holds a bachelor's degree" and supervised 33 employees, including three teams and four supervisors.

29. Dr. Riggsbee reported that despite this experience and responsibility, her salary "is less than three Supervisors with less experience, less responsibility and less year of service to MCSO."

30. Dr. Riggsbee provided this report to HR Director, Alexis Pearson and then Chief Deputy, Kevin Canty.

31. As part of this discussion, Riggsbee had specifically identified to Pearson and Canty that she was concerned that the pay disparity was racially biased and illegal.

32. Dr. Riggsbee asked that the Sheriff's office adjust the racial pay disparity and requested written approval from her supervisor, Chief Deputy Kevin Canty.

33. On July 11, 2024, Chief Deputy Canty signed the written approval for the request.

34. On July 24th, McFadden denied the request without providing a timeline or deadline to respond to the denial.

35. Indeed, McFadden did not even give Dr. Riggsbee notice of the rejection.

36. Five days later, on July 29th, Alexis Pearson told Dr. Riggsbee that McFadden had denied the request.

37. Dr. Riggsbee then provided her response to Sheriff McFadden.

38. In August 2024, Dr. Riggsbee had several communications with McFadden where she again flagged this serious disparity.

39. McFadden told Dr. Riggsbee that he would "take a look at it."

40. On or about September 12, 2024, Dr. Riggsbee again communicated her concerns regarding the racial disparities in pay.

41. But again, McFadden refused to address the racial pay disparity.

## Records Request from the Charlotte Observer

42. During this same time period, in the summer of 2024, the Charlotte Observer made a public records request regarding travel expenses submitted for McFadden's out-of-town trips.

43. On August 1, 2024, Shelby Jones, McFadden's Executive Assistant, called Dr. Riggsbee regarding the request.

44. On behalf of McFadden, Jones then instructed Dr. Riggsbee to alter governmental records – specifically the travel expense reports by McFadden.

45. Jones explained that McFadden did "not want all of that" – meaning the requested records – "to go out."

46. Instead, Jones explained that McFadden "wanted it changed" and wanted Dr. Riggsbee "to do that."

47. Dr. Riggsbee refused because she believed that the request was illegal and would implicate her in illegal conduct.

48. Riggsbee reported that this request was unethical.

## Audit Findings

49. In August 2024, Dr. Riggsbee, as part of her job duties, assisted with the Internal Audit Department with a fraud investigation of the prior Director of Business Operations.

50. The prior director had been accused of contracting with personal friends who did not perform their contractual obligations to the Department.

51. Despite that, these employees were still receiving compensation from the Sheriff's office.

52. As a result of Dr. Riggsbee's own reviews and internal research, she discovered and exposed that several employees were employed and being paid for services not performed.

53. This investigation resulted in the termination of an employee and non-renewal of the contract with another.

### McFadden attempts to retaliate against Dr. Riggsbee

54. Immediately following Dr. Riggsbee's reports, Sheriff McFadden began voicing his opposition toward Riggsbee and taking action against her.

55. Sheriff McFadden asked Chief Deputy Canty to outline Sheriff McFadden's complaints about Dr. Riggsbee.

56. Chief Deputy Canty then provided a memo to McFadden.

57. In that memo, he identified that in June 2024, McFadden referred to Dr. Riggsbee (along with HR Director Alexis) as "problems."

58. This occurred days after Dr. Riggsbee had reported issues regarding racial pay disparity to Pearson and Canty (who then passed on this information to McFadden).

59. Again, on July 3rd, McFadden again expressed that he was "unhappy with Dr. Riggsbee's work," and wanted to place her on a sixty (60) day work-plan."

60. In response to McFadden's request, HR Director Pearson explained that McFadden could not "go right to a work-plan without a coaching and counseling and a documented counseling."

61. Chief Deputy Canty even consulted an attorney who made it clear – there was no basis to place Dr. Riggsbee on a work-plan.

62. Throughout August and September, Chief Deputy Canty outlined the baseless attacks by Sheriff McFadden on Dr. Riggsbee.

63. This included an incident on September 18th, where Chief Deputy Canty noted that McFadden had accused Riggsbee of being "insubordinate," which Canty rejected.

64. In light of the abusive culture created by McFadden, Chief Deputy Kevin Canty resigned on November 1, 2024.

65. In his resignation, Chief Deputy Canty accused McFadden of functioning like a "third-world dictatorship" that has "resulted in pure chaos."

66. Chief Deputy Canty also accused McFadden of "circumvent[ing] the Office of Professional Conduct (OPC) and discard[ing] the results of internal investigation if [he] disliked the results, or if the employee was someone [he] liked" and "weaponiz[ing] OPC to target employees [he has] a personal dislike for. . . ."

67. Chief Deputy Canty also "heard [McFadden] use racist[] language" in the workplace.

## Termination

68. With Canty no longer Dr. Riggsbee's supervisor, Sheriff McFadden acted almost immediately to terminate Dr. Riggsbee.

69. On November 13, 2024, Sheriff McFadden told Dr. Riggsbee that her "services were no longer needed."

70. She was then escorted to her office to get her belongings and then out of the building.

71. In all, Sheriff McFadden retaliated against Dr. Riggsbee, including the compensation, terms, conditions, and opportunities at the Mecklenburg County Sheriff's Office, because of her reports regarding pay disparity and reports of illegal conduct.

72. Defendant has falsely claimed that he terminated Dr. Riggsbee for "unsatisfactory performance."

73. In contrast, just eight weeks before the Sheriff's Office terminated her, Defendant had given Dr. Riggsbee a merit pay increase (effective August 2024).

74. Similarly, her August 7, 2024 Performance Appraisal—signed by then Chief Deputy Kevin Canty—rated her as "Exceeds Expectations."

75. Despite that, Defendant coded the termination as "performance."

76. Defendant's claimed reason for termination of Dr. Riggsbee is simply false.

77. Defendant's actions were retaliatory, as demonstrated by, in part, but not limited to, the following:

    a. The timing of the chain of events between Dr. Riggsbee's reports and her termination;

    b. Sheriff McFadden's knowledge of the report invovling racial disparity and unlawful conduct;

    c. The negative response to Dr. Riggsbee by Sheriff McFadden immediately following the reports;

    d. The request to violate the Sheriff's office policy and place Dr. Riggsbee on an unauthorized employment plan;

    e. The history of McFadden's remarks related to racial discrimination; and

    f. The pre-textual reasons given for her termination.

78. Dr. Riggsbee has now filed this lawsuit in light of Defendant's violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, and North Carolina common law.

79. In addition to violating 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII, and the North Carolina common law, Defendant also violated his own written non-discrimination policies for the Mecklenburg County Sheriff's Office.

## Exhaustion Of Administrative Remedies

80. Dr. Riggsbee filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission.

81. In that Charge, and any amendments and/or attachments thereto, Dr. Riggsbee asserted that Defendant discriminated against and retaliated against her because of her reports, in violation of Title VII.

82. Dr. Riggsbee received her right-to-sue letter from the EEOC on August 20, 2025.

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983 for violations of 42 U.S.C. § 1981 and Title VII

83. Plaintiff re-alleges and incorporates each of the preceding paragraphs as if fully restated here.

84. Dr. Riggsbee, a Black woman, worked for the office of Sheriff of Mecklenburg County from March 2024 through November 2024.

85. Dr. Riggsbee reported issues of racial pay disparities and advocated to Sheriff Garry McFadden to address the racial pay disparities in the workplace.

86. These reports were made consistent with Title VII and Section 1981.

87. McFadden knew that Dr. Riggsbee had made these reports, knew that the pay disparity involved a Black woman compared to white employees, and knew that they involved protected reports of racial discrimination.

88. As a final policy maker regarding personnel of the Sheriff's office, McFadden made the decision to terminate Dr. Riggsbee, intentionally retaliating against her in violation of Section 1981 and Title VII.

89. McFadden retaliated against her because she reported racial pay disparities.

90. Plaintiff sues Sheriff Garry McFadden in his official capacity as the Sheriff of Mecklenburg County and in his individual capacity for the violations of her rights under Section 1981 and Title VII.

91. Section 1981 provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

92. Title VII of the Civil Rights Act of 1964 also prohibits employment discrimination based on race, as well as retaliation against employees who report or advocate against racial discrimination.

93. Dr. Riggsbee opposed Defendant's denial of the "right to make" contracts and the same "security of persons and property as is enjoyed by white citizens" in the United States, as required by federal law.

94. Defendant treated Dr. Riggsbee adversely after she opposed and reported unlawful race discrimination.

95. Defendant engaged in material adverse actions against Dr. Riggsbee, which might well dissuade a reasonable person from opposing or reporting the discrimination had they known they would face the adverse actions.

96. Defendant's actions, omissions, and decisions were taken to discourage other employees from opposing discrimination.

97. Defendant committed these acts, omissions, and decisions in response to, and in retaliation for, Dr. Riggsbee's exercise of her statutory and lawful rights under Title VII and Section 1981.

98. In committing the acts complained of herein, Defendant acted under color of state law to deprive Dr. Riggsbee of certain constitutionally and statutorily protected rights.

99. Defendant retaliated against and terminated Dr. Riggsbee because of her protected reports and a direct causal link exists between her constitutionally protected conduct and Defendant's retaliatory action based on the close temporal proximity between her acts and her termination.

100. Defendant's actions, omissions, and decisions have deprived Dr. Riggsbee of her rights, privileges, and immunities secured by the U.S. Constitution and laws in violation of 42 U.S.C. § 1983.

101. Liability and redress for such actions, omissions, and decisions exists under 42 U.S.C. § 1983.

102. The grounds and reasons offered by Defendant for the adverse actions, omissions, and decisions taken against Dr. Riggsbee are false and pretextual.

103. As a direct and proximate result of Defendant's violation of Dr. Riggsbee's constitutional rights, she has suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C §1983, Title VII, and §1981.

104. In addition, Defendant's actions, omissions, and decisions were designed to cause, and did cause, Dr. Riggsbee to suffer humiliation and harm to her reputation, emotional and mental injuries, pain and suffering, and financial and other adverse harm.

## SECOND CLAIM FOR RELIEF
## Unlawful Retaliation In Violation of Title VII of the Civil Rights Act of 1964

105. Plaintiff re-alleges and incorporates each of the preceding paragraphs as if fully restated here.

106. Defendant retaliated against Dr. Riggsbee and terminated her for her reports regarding racial pay disparity.

107. Defendant had no legitimate business reasons for her termination.

108. Each act of retaliation is in violation of Title VII of the Civil Rights Act of 1964's anti-retaliation and anti-discrimination provisions.

109. Defendant's above-described acts were done in violation of Title VII and proximately caused Dr. Riggsbee's substantial injuries and damages.

110. As a direct and proximate result of Defendant's willful, knowing, and intentional

discrimination and retaliation against her, Dr. Riggsbee has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.

111. Dr. Riggsbee is thereby entitled to general, compensatory and punitive damages in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF
### Wrongful Termination for Violation of Public Policy

112. Plaintiff re-alleges and incorporates each of the preceding paragraphs as if fully restated here.

113. Dr. Riggsbee worked for the office of Sheriff of Mecklenburg County from March 2024 through November 2024 as the director of business operations.

114. Dr. Riggsbee reported violations of North Carolina law including, (1) unlawful pay disparity based on race and (2) violations of the public records request laws of the State of North Carolina.

115. In addition, Dr. Riggsbee also refused to violate federal and state law regarding altering public records in response to a public records request.

116. Retaliation and termination due to these reports, her opposition to unlawful pay disparity, and her refusal to change records violated the public policy of North Carolina, because it has a tendency to be injurious to the public or against the public good.

117. This specifically includes the public policy of North Carolina as outlined in North Carolina General Statute § 14-119 and North Carolina General Statute Chapter 132.

118. Because of these protected reports, Defendant retaliated against Dr. Riggsbee and fired her.

119. Specifically, Defendant's termination was motivated by Dr. Riggsbee's engagement in protected activity, including her reporting, opposition and refusal to engage in unlawful conduct.

120. Dr. Riggsbee has suffered damages including mental anguish, back-pay and front-pay, and all other remedies available.

121. Dr. Riggsbee's damages were proximately caused by Defendant's termination of her.

WHEREFORE, Plaintiff, Dr. Angelia Riggsbee, prays as follows

a. That this matter be tried by a jury.

b. That the court issue a permanent injunction enjoining Defendant, his agents, successors, employees, and those acting in concert with Defendant from engaging in any employment practice which discriminates on the basis of race as described above;

c. All damages to which Plaintiff may be entitled pursuant to this Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

d. Actual, general, compensatory, liquidated, statutory, special and punitive damages in an amount in excess of seventy-five thousand doallar ($75,000.00) to be determined by a jury, against Defendant.

e. Reasonable attorney's fees and costs of the action against Defendant, with conditional awards in the event of appeal;

f. Pre-judgment interest and post-judgment interest, until paid, at the highest rate permitted by law; and

g. Such other, further, or different relief as the Court deems just, proper or equitable.

Respectfully submitted,

/s/ *Amanda A. Mingo*
AMANDA A. MINGO, NC STATE BAR NO. 24423

RAWLS, SCHEER, CLARY, & MINGO, PLLC
2333 RANDOLPH RD., STE. 100
CHARLOTTE, NC 28207
TELEPHONE: 704-376-3200
AMINGO@RSCMLAW.COM

and
/s/ *Michael Patrick Doyle*
MICHAEL PATRICK DOYLE
(Pro Hac Vice Pending)
JEFFREY I. AVERY
(Pro Hac Vice Pending)
DOYLE DENNIS AVERY LLP
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: 713.571.1146
Fax:   713.571.1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFF**